IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **99-cv-2077-JLK**

**MARK E. SHEPHERD,**

  Plaintiff,

v.

**UNITED STATES OLYMPIC COMMITTEE, a corporation,**

  Defendant.

_____

Civil Action No. **03-cv-1364-JLK**

**SCOT HOLLENBECK**
**JOSE ANTONIO INGUEZ**
**JACOB WALTER JUNG HO HEILVEIL, and**
**VIE SPORTS MARKETING, INC., a Georgia corporation,**

  Plaintiffs,

v.

**UNITED STATES OLYMPIC COMMITTEE, a federally chartered corporation, and**
**U.S. PARALYMPICS, INC., f/k/a UNITED STATES PARALYMPIC CORPORATION,**
**a Colorado non-profit corporation,**

  Defendants.

_____

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' DISPOSITIVE MOTIONS RE ATHLETE CLAIMS**
_____

KANE, J.

# I.  INTRODUCTION

These disability discrimination actions brought by elite Paralympic wheelchair

athletes push the margins of federal disability discrimination laws as applied to the United States Olympic Committee (USOC) and Congress' enactment of our system of international amateur athletic competition.  Civil Action No. 99-cv-2077-JLK, brought by wheelchair basketball Paralympian Mark Shepherd, challenges the USOC's purported failure to provide him with the services, benefits and financial and other support routinely provided to his Olympic counterparts.  Civil Action 03-cv-1364 asserts similar claims on behalf of elite wheelchair racers Scott Hollonbeck, Jose Antonio Iniguez and Jacob Walter Jun Ho Heilveil, as well as claims related to the USOC's marketing of U.S. Paralympic trademarks as they relate to Hollonbeck's marketing company Vie Sports.

According to the Plaintiff wheelchair athletes, the USOC was established by Congress to oversee matters pertaining to the selection, training and participation of elite disabled and non-disabled amateur athletes in international Olympic, Paralympic, and Pan-American competition.  Charged with obtaining the best amateur representation possible in both Olympic and Paralympic events, Plaintiffs claim it is discriminatory for the USOC to provide them programming, privileges, and financial support inferior to that provided non-disabled athletes under the Olympic program.  Plaintiffs claim the USOC also discriminates against elite Paralympic athletes by promoting, marketing and selling (or limiting U.S. Paralympic's ability to promote, market and sell) rights to the Paralympic trademark at a level below the level it promotes, markets and sells rights to the Olympic mark, which has the effect of limiting the funds available for Paralympic programs and limiting the public's awareness of the Paralympics and individual

Paralympic athletes.  Finally, Plaintiffs claim the statutory governance structure of the USOC discriminates against Paralympic athletes by denying them representation.  It is these "Athlete Claims," brought under § 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act, and the parties' cross-motions regarding their viability under the federal anti-disability discrimination laws, that are before me now for consideration.[1]

Given the important and novel issues raised, I set the motions for oral argument. Argument has been completed, and my rulings follow.

## A.  Statutory Framework.

### The ASA.

Congress originally chartered the United States Olympic Association in 1950 to organize and promote the United States' participation in international Olympic competition.  The USOA became the USOC in 1964.  In 1978, concerned with "'the disorganization and the serious factional disputes that seemed to plague amateur sports in

---

[1] In addition to the "athlete" claims asserted on behalf of disabled athletes generally in both cases under the Americans with Disabilities Act, there are individual common law claims for damages asserted by Plaintiff Shepherd in 99-2077 and by Plaintiff Vie Sports Marketing in 03-1364.  Shepherd, who was employed by the USOC for a period of time during which he also trained as a Paralympic athlete, seeks damages from the USOC based on the USOC's refusal to allow him to train during work hours which Shepherd claims violated the express written and oral terms of his employment contract.  Vie Sports, a sports marketing company formed by Plaintiff Hollenbeck in 2000 to market the Paralympic brand and trademark, asserts separate breach of contract and promissory estoppel claims against the USOC in 99-2077 based on the USOC's alleged failure to support or to allow Vie Sports to sell the rights to the Paralympic mark in the open market.  These claims were addressed during oral argument in September 2005 and will proceed separately from any "athlete" claims that survive summary judgment.

the United States,'" Congress enacted the Ted Stevens Olympic and Amateur Sports Act ("ASA"), P. L. 95-606 (codified at 36 U.S.C. § 371 *et seq.* (1978)).  *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 543-544 (1987)(quoting from H. R. Rep. 95-1627 at p. 8)("1978 House Report")).  The ASA charged the USOC with responsibility for coordinating amateur athletics for the Olympic and Pan-American Games and for resolving disputes involving national governing bodies of individual sports.  *See* 1978 House Report at 8, 1978 WL 8517 (Leg. Hist.).  The duties of developing interest and participation in amateur athletics, as well as determining who may sponsor amateur athletic competition in the United States and what athletes will be sanctioned to compete on behalf of the United States in particular competitions, were left under the ASA to individual amateur sports organizations selected by the USOC as the "national governing bodies" in each sport on the Olympic or Pan-American program.  36 U.S.C. §§ 391 (selection and requirements for selection as "national governing body"), 392 (duties of national governing bodies).

With respect to the disabled, the original ASA identified as one of the 14 enumerated purposes of the USOC "to encourage and provide assistance to amateur athletic programs and competition for handicapped individuals, including where feasible, the expansion of opportunities for meaningful participation by handicapped individuals in programs of athletic competition for able-bodied individuals."  36 U.S.C. § 374(13).[2]

---

[2]      Specifically, the 1978 ASA stated the "objects and purposes" of the USOC as follows:

(1) establish national goals for amateur athletic activities and encourage the attainment of those goals;

(2) coordinate and develop amateur athletic activity in the United States directly relating to international amateur athletic competition, so as to foster productive working relationships among sports-related organizations;

(3) exercise *exclusive jurisdiction, either directly or through its constituent members or committees, over all matters pertaining to the participation of the United States in the Olympic Games and in the Pan-American Games, including the representation of the United States in such games, and over the organization of the Olympic Games and the Pan-American Games when held in the United States*;

(4) obtain for the United States, either directly or by delegation to the appropriate national governing body, the most competent amateur representation possible in each competition and event of the Olympic Games and of the Pan-American Games;

(5) promote and support amateur athletic activities involving the United States and foreign nations;

(6) promote and encourage physical fitness and public participation in amateur athletic activities;

(7) assist organizations and persons concerned with sports in the development of amateur athletic programs for amateur athletes;

(8) provide for the swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition;

(9) foster the development of amateur athletic facilities for use by amateur athletes and assist in making existing amateur athletic facilities available for use by amateur athletes;

(10) provide and coordinate technical information on physical training, equipment design, coaching, and performance analysis;

(11) encourage and support research, development, and dissemination of information in the areas of sports medicine and sports safety;

(12) encourage and provide assistance to amateur athletic activities for women;

(13) *encourage and provide assistance to amateur athletic programs and competition for handicapped individuals, including, where feasible, the expansion of opportunities for meaningful participation by handicapped individuals in programs of athletic competition for able-bodied individuals*; and

(14) encourage and provide assistance to amateur athletes of racial and ethnic minorities for the purpose of eliciting the participation of such minorities in amateur athletic activities in which they are underrepresented.

36 U.S.C.A. § 374 (1990)(emphasis added).

National governing bodies were delegated the specific duty to "encourage and support amateur athletic sports programs for handicapped individuals and the participation of handicapped individuals in amateur athletic activity, including where feasible, the expansion of opportunities for meaningful participation by handicapped individuals in programs of athletic competition for able-bodied individuals." 36 U.S.C. § 392(7).  The ASA made no mention of the Paralympic movement or Paralympic Games, and articulated its mission in terms of fostering and developing amateur international competition at the Olympic and Pan-American Games only.   *See id.*, § 374, *supra* n. 2.

In 1998, the ASA was amended to reflect "significant changes" in Olympic and amateur sports at the time, specifically including  the "significant"  growth "in size and prestige" of the Paralympics.  *See* S. Rep. 105-325 at p.2, 1998 WL 604018 ("1998 Senate Report").   The 1998 version of the ASA, now codified at 36 U.S.C. § 220501 *et seq.*, amended the statement of the USOC's purposes objectives at § 374(3) and (4) to add participation in the "Paralympic Games"(recodified at 36 U.S.C. § 220503(3), (4))[3] and

---

[3]      For example, as amended § 22503(3) and (4) charge the USOC

(3)  to exercise exclusive jurisdiction, directly or through constituent members of committees, over –
    (A) all matters pertaining to United States participation in the Olympic Games, the *Paralympic Games*, and the Pan-America Games, including representation of the United States in the games; and
    (B) the organization of the Olympic Games, the *Paralympic Games*, and the Pan-American Games when held in the United States;

(4)  to obtain for the United States, directly or by delegation to the appropriate national

amended § 391 to recognize "paralympic sports organizations" as national governing

bodies for sports for which no national governing body had been designated.  *Id.*

§ 220522(b).  *See* 1998 Senate Rep. at 17.[4]

My overall impression in analyzing this legislative history is that the ASA

distinguishes between authority and power the USOC has to oversee the United States'

participation in international amateur athletic competition and the authority it has

nationally to regulate and govern amateur sports nationally to obtain the best

representation in the Olympic/Pan-American and Paralympic Games.  Vis á vis the

*international* community, the USOC "represent[s] the United States as its national

Olympic committee in relations with the International Olympic Committee and the Pan-

American Sports Organization and as [the United States'] national Paralympic committee

in relations with the International Paralympic Committee," "coordinate[s] and develop[s]

---

governing body, the most competent amateur representation possible in each event of the Olympic Games, the *Paralympic Games*, and Pan-American Games . . . .

36 U.S.C. § 22503(3), (4)(emphasis added.)  In addition, § 374(13) was changed to replace the term "handicapped individuals" with the more appropriate "disabled amateur athletes."  *Id.* § 22503(13)(object and purpose of USOC includes "to encourage and provide assistance to amateur athletic programs and competition for *amateur athletes with disabilities*, including, where feasible, the expansion of opportunities for meaningful participation by such *amateur athletes* in programs of athletic competition for able-bodied *amateur athletes*.").

36 U.S.C. § 220503(13)(changes in italics).

[4]      For example, the National Wheelchair Basketball Association (NWBA) serves as the national governing body for men's, women's and youth wheelchair basketball in the United States.  *See* http://www.nwba.org, "Mission Statement."

amateur athletic activity in the United States directly related to international amateur athletic competition," and "organize[s], finance[s], and control[s] the representation of the United States in the competitions and events of the Olympic, Paralympic and Pan-American Games."  36 U.S.C. §§ 220505(c)(2), (3).  Vis á vis individual citizens, however, and while charged generally to "encourage and provide assistance to amateur athletic activities for women" (§ 220503(12)), "minorities" (§ 220503(14)), and "amateur athletes with disabilities" (§ 220503(13)), the USOC effects this purpose under the ASA first by *selecting and recognizing* "national governing bod[ies]" (or, where necessary because a sport exists only for the disabled, "paralympic sports organizations") for each amateur sport in the Olympic, Pan-American or Paralympic Games (§ 220521 & 22) and *then delegating to them* the duties of "develop[ing] interest and participation throughout the United States" in that sport (§ 220524(1)), "allow[ing] an amateur athlete to compete in any [sanctioned] international amateur athletic competition conducted by any amateur sports organization" (§ 220524(5)), and "encourag[ing] and support[ing] amateur athletic sports programs for individuals with disabilities and the participation of individuals with disabilities in amateur athletic activity." § 220524(7).  Thus, while Plaintiffs are not incorrect in claiming the USOC is charged with "obtaining" the best amateur representation both for the Olympic *and* Paralympic Games, they cannot ignore that it does so through "the appropriate national governing bod[ies]" to which the responsibility for supporting athletic opportunities and participation for all athletes, including the disabled, is delegated.  *See* 36 U.S.C. §§ 22503(4)("through the appropriate national

governing body"), 22523-24 (authority and duties of national governing bodies include developing interest and participation in amateur sports they represent and to encourage and support amateur sports programs for individuals with disabilities).

Moreover, it is only those individual governing bodies that have any express duties under the ASA to provide equal or nondiscriminatory participation opportunities within their particular Olympic or Paralympic sport, and even then, only on the non-disability-based factors of race, color, age, religion, sex, or national origin.  36 U.S.C. § 220522(a)(8).[5]  The omission of disability as a prohibited discriminatory factor under 36 U.S.C. § 220522(a)(8) is significant.  It is precisely because athletes are classified within their sports (or provided disability-specific sports) on the basis of their disabilities that the need for protection on the basis of that disability becomes problematic.  Under the ASA, for example, the NWBA may not discriminate on the basis of race, sex or national origin.  A prohibition against disability discrimination is omitted, ostensibly because the limits of federal antidiscrimination law are reached simply by the accommodation.  No

---

[5]      An amateur sports organization is eligible to be recognized, or to continue to be recognized, as a national governing body only if it

* * *

(8) provides an equal opportunity to amateur athletes  . . . to participate in amateur athletic competition, without discrimination on the basis of race, color, religion, sex, age, or national origin . . .

36 U.S.C. § 220522(a).  The equal opportunity provisions do not preclude discrimination on the basis of disability, ostensibly because disabled amateur athletes participate on the very basis of their disability.

proscription against disability discrimination binds the NWBA because the NWBA's

charges are all disabled by definition.

The question, then, becomes whether some other statute or regulatory scheme

operates to prohibit the USOC – as the umbrella organization charged with coordinating

national governing organizations such as the NWBA and producing, through them, the

best American representation at the Olympic, Pan-American and Paralympic Games –

from allocating reduced or inferior benefits to athletes training for Paralympic, as

opposed to Olympic or Paralympic competition.  According to Plaintiffs, the ADA and

Rehabilitation Act do so.

### *ADA/Rehabilitation Act.*

The Rehabilitation Act of 1973 and ADA comprise a comprehensive federal

mandate to remedy and eliminate discrimination against disabled individuals.  Section

504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a

disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 29

U.S.C. § 794(a).  The ADA, enacted in 1990, expanded liability for disability

discrimination.  Title I of the ADA, codified at 42 U.S.C. § 12112, prohibits covered

employers from discriminating against individuals on the basis of disability in the

workplace regardless of their status as recipients of federal funding; Title II (§ 12132)

prohibits public entities from discriminating against individuals or excluding them from

participation in, or the benefits of, their services or programs on the basis of disability;

and Title III (§ 12182) provides injunctive relief against private entities who discriminate

against the disabled in the operation of "places of public accommodation."  *See PGA*

*Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001).  It is Title III that provides the basis

for Plaintiffs' claims in this case.

Title III provides "[n]o individual shall be discriminated against on the basis of

disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person

who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C.

§ 12182(a).  A "place of public accommodation" for purposes of Title III is a facility

generally open to the public at large, including restaurants, hotels, libraries, stores,

theaters, stadiums, zoos, and the like.  *Id.* § 12181(7).  General prohibitions under Title

III include denying, on the basis of disability, opportunities to participate in or benefit

from the goods, services, privileges or accommodations of the private entity (§

12182(b)(1)(A)(i)); affording disabled individuals the opportunity to participate in or

benefit from such goods or services in a manner "not equal to that afforded to other

individuals" (§ (b)(1)(A)(ii)); or providing disabled individuals with a good, service,

facility, privilege, or accommodation "separate from" that afforded other individuals

unless necessary to provide the individual a benefit "as effective" as that provided to

others.  (§ (b)(1)(A)(iii)).  It is also unlawful under Title III to impose or apply eligibility

criteria for use of a public accommodation that screen out or tend to screen out the

disabled from fully and equally enjoying any goods, services, facilities, privileges, or advantages of that public accommodation (42 U.S.C. § 12182(b)(2)(A)(i)); to fail to modify policies or to take steps necessary to afford the disabled goods, services, facilities, etc. of the accommodation (§ (b)(2)(A)(ii) & (iii)); and failure to remove architectural and communication barriers to ensure that no person with a disability is excluded or denied goods, services, facilities, etc. (§ (b)(2)(A)(iv), (v)).

In their Amended Complaint, Plaintiffs assert three different theories of discrimination under Title III:  (1) discrimination in the denial of participation in Olympic Programming in violation of § 12182(b)(1)(A)(i); (2) discrimination in the provision of an unequal participation opportunity in violation of § 12182(b)(1)(A)(ii); and (3) discrimination through the use an eligibility criterion for Olympic Programming that screens out the disabled from full and equal enjoyment of the public accommodation in violation of § 12182(b)(2)(A)(i)).  Am. Compl. ¶¶ 2, 48-59.[6]  Plaintiffs specifically do *not* assert a claim based on the provision of a separate benefit under § 12182(b)(1)(A)(iii).

Plaintiffs' Title III claim, then, rests on a set of carefully crafted assumptions. First, based on the USOC's "control" over administration, housing, training, and competition in the United States, together with its operation of Olympic Training Centers

---

[6]    The theories of discrimination set forth in Title III of the ADA also constitute discrimination under the Rehabilitation Act.  *Compare* 28 C.F.R. §  §§ 41.51(b)(1)(i)-(vii) (2006)("General prohibitions against discrimination") *with* § 84.13 (Rehabilitation Act regulation from which 42 U.S.C. § 12182(b)(2)(A)(i) was derived).  *See* H.R. Rep. No. 101-485, pt. 2, at 105 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 388).

in Colorado Springs (Colorado), Chula Vista (California) and Lake Placid (New York), Plaintiffs claim the USOC "operates places of public accommodation" such that it is a covered entity under Title III.  Am. Compl., 03-cv-1364, ¶¶  24, 26-33.  Plaintiffs then characterize programming benefits offered athletes by the USOC and Paralympic Committee as "goods, services, facilities, privileges, advantages, or accommodations" of those "places of public accommodation," and contend the U.S. Olympic and Paralympic Committees discriminate against them by denying them, on the basis of their disabilities, the "full and equal enjoyment" of those programming benefits.[7]  *Id.* ¶¶ 144-146.  That each of these characterizations is strained is something I address in the next section.

For their relief, Plaintiffs seek an injunction requiring Defendants to cease their discrimination and provide them "full and equal enjoyment of their goods, services, facilities, privileges, advantages, and/or accommodations in a fashion to be specified following trial."  Am. Compl., 03-cv-1364 at p. 24 "Prayer for Relief."[8]  Plaintiffs

---

[7]     For example, Plaintiffs claim they are relegated to lowest priority in terms of using Olympic training facilities, receive few or reduced financial incentives, and are ineligible for tuition grants, the Resident Athlete Program, or insurance.  The USOC, according to Plaintiffs, does not even supply Paralympians with uniforms.  The result, Plaintiffs contend, is that, they must pay significant training expenses out of their own pockets, impairing their ability to train for Paralympic competition.  *See* Am. Compl., 03-cv-1364 at ¶¶ 48-60.   Other complaints are less tangible, including Plaintiff Hollonbeck's allegations that he was discriminated against during exhibition events in the 1992, 1996 and 2000 Olympic Games by being denied benefits such as marching in the opening ceremonies or receiving prize money for winning medals.  *Id.* ¶¶ 61-67.  Since Hollonbeck's participation in the 2000 Olympics, Paralympians now receive financial awards for gold, silver and bronze medals, but Plaintiffs contend the practice remains discriminatory because awards are at 1/10th the amount of Olympic medal awards.  *Id.* ¶¶ 51-53.

[8]     Plaintiffs also seek a "declaration" that Defendants' discriminatory practices violate the ADA and Rehabilitation Act.  Declaratory relief is redundant and therefore unavailable under

equivocate as to the specifics of any injunction ultimately issued, acknowledging "equal" allocations would not necessarily be appropriate or required under the ADA, and urging the adoption of an "equitable" or "proportionate" remedial standard along the lines of that available under Title IX and its implementing regulations.[9]  Plaintiffs support their reliance on Title IX with a citation to *Grove City College v. Bell*, 465 U.S. 555, 566 (1984), and in particular in the Supreme Court's look to the Rehabilitation Act as an interpretive guide for Title IX, on grounds both find their source in the antidiscrimination provisions of Title VI of the Civil Rights Act of 1964.   While I appreciate the analogy and agree Title IX's regulatory remedial scheme works well with Plaintiffs' theory of relief in this case, I cannot agree federal courts are authorized to cobble together congressional enactments in this manner.  As I will explain more fully below, Plaintiffs' request that I graft a remedial scheme promulgated under a statute banning sex discrimination onto statutes prohibiting disability discrimination, and then infuse both into the statute establishing the federally chartered corporation that oversees the country's

---

these circumstances, where it seeks nothing more than a legal determination already before the court on Plaintiffs' civil rights claims.  *See Saum v. Widnall*, 912 F. Supp. 1384, 1394 (D. Colo. 1995)(Kane, J.)("declaration" of constitutional violation would be gratuitous reiteration when constitutionality of defendant's actions already before the court)(citing cases).

[9]  As acknowledged by Plaintiffs' counsel at oral argument, the precise nature of Plaintiffs' claim for relief is difficult to articulate.  *See* Rep. Tr. (10/4/05) at p.16, 42, 59 (acknowledging "exact" or equal funding or benefits is not required under the ADA, and suggesting adoption of "equitable" or "proportionate" remedial standard along the lines of that which Plaintiffs claim is available under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, and its implementing regulations, which prohibit sex discrimination in the allocation of benefits between men's and women's athletic programs and suggest evolving standards for determining compliance.)

14

amateur athletic system and has exclusive jurisdiction over matters pertaining to international Olympic, Paralympic and Pan-American competition, simply falls outside the scope of federal judicial authority.

Defendants deny Plaintiffs have stated a viable claim for disability discrimination. The crux of the issues raised are set forth in the parties' cross-motions for summary judgment in *Shepherd* (Doc. Nos. 139 and 140) and in the USOC's 12(b)(6) Motion to Dismiss in *Hollonbeck* (Doc 3).  The USOC denies the ADA or Rehabilitation Act confer a cause of action for disparate treatment or discrimination in the allocation of resources between Olympic/Pan-American athletes and Paralympians, maintaining these are separate programs across which differences in allocation are not discriminatory for purposes of federal civil rights legislation because they are not comparable.

## B.  The Problem of "Fit."

My ultimate and reluctant conclusion is that the USOC is correct and Plaintiffs have no actionable right under the ADA or Rehabilitation Act to enjoin the USOC's actions in allocating lesser privileges and benefits to Paralympic athletes than Olympic athletes.  The overarching issue is *duty*, namely, whether the USOC has a duty to provide Paralympians with opportunities, support and benefits similar, proportionate, or equal to those provided Olympians.  The language of the ASA imposes no such duty.[10]  The

---

[10]  *See supra*, n. 5 and accompanying text.

question is whether, directly or by reference to other civil rights laws (such as Title IX, the ADA and Rehabilitation Act) give rise to one.

Subject matter jurisdiction is uncontested and under a liberal reading of the parties' pleadings I find it exists under 28 U.S.C. § 1343 and 1367.  While I proceed to analyze Plaintiffs' claims under the ADA and Rehabilitation Acts, I pause to express my overarching concern that, absent an extension of existing law by Congress or a relevant regulatory agency, neither the wrong of which Plaintiffs complain nor the relief they seek "fit" within the rubric of the ADA or Rehabilitation Act.

My initial concern is with the assertion that U.S. Olympic Training Centers are "places of public accommodation" within the contemplation of 42 U.S.C. § 12181(7) and that financial support, insurance, being able to walk in opening ceremonies, receiving prize money, or serving on governing bodies are "goods, services, facilities, privileges, [or] advantages" attendant the operation of those "places" for purposes of the ADA. Olympic Training Centers are venues to which only the most select athletes in the nation have access.  They are not recreation centers, stadia or arenas held out for use by the non-disabled public at large.  The question of the ADA's applicability, in my view, is a serious threshold question that the parties largely avoid.

The phrase "public accommodation" is defined for purposes of Title III in terms of 12 extensive categories of facilities leased or operated by private entities "if the operations of such entities affect commerce." The facilities covered are:

(A) an inn, hotel, motel, or other place of lodging . . . ;

16

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, *or other place of exercise or recreation.*

42 U.S.C. § 12181(7)(emphasis added), *applied in Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp.2d 1281, 1289 -1290 (D. Kan. 2003), *aff'd* 427 F.3d 1326 (10th Cir. 2005).  Plaintiffs contend the USOC's training facilities fall within the category of "gymnasium, health spa . . . or other place of exercise or recreation" and therefore constitute a "place of public accommodation" under subsection (L).  While the categories listed at § 12181(7) are to be "construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled," *Bauer* at 1290 (citing *Martin*, 532 U.S. at 666-67), there is something fundamentally different about the establishments and "places of exercise and recreation" open to the non-disabled public generally – which appear to be what the category at § 12181(7)(L) describe – and the

United States' four Olympic Training Centers.

Unlike the public and private golf courses operated or "leased" by the PGA in *Martin* – to which all paying customers have access regardless of ability – the training facilities operated by the USOC are accessible only to those *already* selected by the national governing bodies to the Olympic, Pan-American or Paralympic teams in their individual sports and identified as elite, world-class athletes. *C.f. Martin,* 532 U.S. at 677-78 (among the "privileges" offered members of the general public who pay to play on PGA-operated golf courses is the privilege of vying to qualify for and play in the PGA Tour); *Akiyama v. United States Judo Inc.*, 181 F. Supp.2d 1179, 1183 (W.D. Wa. 2002)(applying *Martin* and holding that the Civil Rights Act's prohibition against discrimination on basis of religion applied to amateur judo competition where members of general public were welcome to test their skills and talents in preliminary tournaments designed to identify the best competitors).   Absent any allegation that the privileges and benefits afforded athletes at the U.S. Olympic Training Centers are available to members of the general public vying for a berth on the U.S. Olympic or Paralympic team, it is difficult to say that *Martin* applies.  Does the ADA mandate "full and equal enjoyment" of world-class training facilities to which only the fewest among us have access, disabled or non-disabled?  At best, the Supreme Court in *Martin* left unaddressed the question raised in the instant case, namely, whether "places of public accommodation" to which the non-disabled do *not* have general access fall within the purview of Title III.

Moreover, the benefits Plaintiffs seek relate less to the USOC's physical facilities

18

than to the teams they put forth for international competition.  This, too, stretches the

"fit" between the discrimination alleged and the jurisdictional basis of Plaintiffs claims

under the ADA.  In *Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 223 (E.D. Mo. 1996), for

example, the district court determined it lacked jurisdiction over a cognitively disabled

child's Title III claim against U.S. amateur hockey organization because plaintiff was

challenging the "denial of participation in the youth hockey league instead of denial of

access to a place of accommodation, i.e. the ice rink."  *Id.* (youth hockey league is not a

"place of public accommodation" for purposes of Subchapter III of the ADA).  Only

because Plaintiffs in the instant case challenge the denial of their full and equal

enjoyment of the USOC's physical facilities (in their relegation to third priority for their

use) do they survive scrutiny under this threshold jurisdictional requirement.

The problem of "fit" is further underscored by a look at the selective comparisons

on which Plaintiffs rely.  Plaintiffs allege discrimination in their treatment as disabled

individuals by the USOC as Paralympians compared to the USOC's treatment of "non-

disabled" Olympic (and Pan-American) athletes.  The distinction is muddled by the fact

that disabled athletes are not *per se* disqualified from participation in the Olympics or

Pan-American Games.[11]  Because "disabled" individuals can and have participated in the

---

[11]   The Paralympics provide participation opportunities for elite athletes belonging to six
different disability groups:  amputee, cerebral palsy, visual impairment, spinal cord injuries,
intellectual disability and a group which includes all those that do not fit into the aforementioned
groups (*les autres*).  Athletes whose disabilities do not impact their ability to participate in events
recognized by the International Olympic Committee (i.e., deaf swimmer Terence Parkin, who won
a silver medal in the 2000 Olympics in Sydney) are not required to participate in the Paralympics
and are ostensibly not part of Plaintiffs' theory of disability discrimination.

Olympics and Pan-American Games, the comparison categories on which Plaintiffs rely are not necessarily the "disabled" and non-disabled as those distinctions are drawn under the ADA, but Olympic and Paralympic athletes.

Finally, I question the viability of Plaintiffs' theory of disability-based "discrimination" as conflating Olympic benefits offered or not offered to Paralympians with the benefits of access or equal enjoyment of public accommodations by the disabled. Because this conflation is ultimately what dooms Plaintiffs' claims under an ADA analysis, the question is largely academic in this prefatory context. Wheelchair athletes are obviously treated differently (i.e. "discriminated" against) on the basis of their disability in their relegation to the Paralympic wheelchair basketball event as opposed to the Olympic basketball event. This difference in treatment or access, however, which is obviously based on and defined solely by the player's disability, is not the "discrimination" Plaintiffs seek to call out. Rather, Plaintiffs challenge the lesser or inferior quality of the benefits allocated the Paralympic wheelchair basketball athletes by the USOC, claiming the different allocation is based on eligibility criteria (membership on the Olympic team) that screens out or tends to screen out disabled elite athletes. Again, there is an amalgam of standards forming the basis for Plaintiffs' claim. Plaintiffs, for example, take pains to distinguish theirs from a claim that the USOC provides them with an ineffective "separate benefits" under § 12182(b)(1)(A)(iii) because that analysis forces them into a separate-program paradigm that constrains their theory discrimination. Yet the remedy Plaintiffs seek is precisely that they be given benefits and privileges "as

effective" or "equivalent to" those provided Olympians.  Is a lack of parity or inequality

between Paralympic and Olympic programming actionable except as between "separate"

programs?  Given the significantly smaller population (the disabled) from which

Paralympians are drawn, the Paralympic Games are smaller in scale with fewer

participants than the Olympics and Pan-American Games.   Policies directing a lesser

allocation of resources between the Olympians and Paralympians may simply reflect that

fact wholly independently of any disability-based discrimination.[12]   Plaintiffs concede

this point, but again invoke Title IX and its implementing regulations to urge an

application of the ADA that would compel the USOC's to comply with its mandated

purpose to develop and increase amateur athletic opportunities for disabled athletes, not

merely to reflect the status quo.

Plaintiffs' goals, noble and inspiring, extend beyond the reach of the courts to find

and enforce under the ADA or the Rehabilitation Act.  The Title IX analogy is apt only to

the extent it suggests new legislation or the amendment of the USOC's federal charter

pursuant to which a regulatory scheme for the equitable remediation of discriminatory

allocations between disabled and non-disabled representatives on the United States' elite

---

[12]      As Defendants argue, the fewer number of participants and internationally fielded teams in the Paralympic Games results in American Paralympians, for example, having significantly greater chances of medaling at the Paralympic Games than American athletes competing in the Olympics. Parity in medal awards, then, would result in U.S. Paralympic athletes receiving far more than their Olympic counterparts.  Of course, these fact-based scenarios are germane only to the extent they capture the complexity of the "discrimination" question and illustrate grounds for my unease on the issue of "fit."  They are not germane, and I do not consider them, as part of my analysis of Plaintiffs' claims under a Rule 12(b)(6) standard.

international athletic teams.  Title IX does not infuse the ADA with a remedial scheme that then infuses the ASA with a cause of action for the "discrimination" alleged in this case.  Title III of the ADA entitles disabled individuals with the right to seek to enjoin private entities from providing unequal or ineffective opportunities to enjoy or participate in accommodations made available to the public generally.  The USOC's Paralympic program, with its attendant differences in perks and privileges compared to the USOC's Olympic program, exists to provide disabled individuals with participation opportunities fundamentally premised on and defined by the disabilities Plaintiffs argue cannot lawfully form the basis for separate treatment.  There is an unavoidable nonsequitur to the assertion.

In short, I am troubled that Plaintiffs' theory of relief fundamentally overreaches, looking to the courts and federal antidiscrimination law to remedy inequities in the *quality* of the accommodation afforded certain disabled elite athletes to compete internationally in amateur athletics – accommodations that are defined exclusively by those athletes' inability to compete without accommodation – that are not enjoyed by the non-disabled public at large and which exist solely as a reflection of political will (or lack thereof) within the USOC and/or the legislative and executive branches of government directing its charter.

Do I decry a culture that relegates Paralympians to second class status in the quantity and quality of benefits and support they receive from the USOC?  Emphatically yes.  I conclude, however, that the ADA and Rehabilitation Act are aimed at the baser

stuff of discrimination, such as the denial generally of a disabled person's right to participate fully and equally in public life, including places offering sports and recreation to the general public.  The ADA and Rehabilitation Act simply do not apply to the wrongs alleged by Plaintiffs.

In my view, the inequities and injustices Plaintiffs describe are ultimately for the legislative or executive,[13] and not judicial, branches of government to acknowledge and rectify.  It appears, however, that for purposes of the instant Motions Defendants agree the ADA and Rehabilitation Act apply to the USOC and the U.S. Paralympic Committee and reach their programming benefits and decisions.  For purposes of appeal and in order fully to develop the record, I proceed to address Defendants' Motions directed to the merits of Plaintiffs' claims.

## II.  MERITS.

In its effort to train and obtain the best United States athletes for the Olympic Games, the USOC offers Olympic athletes benefits and incentives.  This Olympic "programming" includes providing $25,000, $10,000, and $2,500, respectively, for each

---

[13]     The legislative branch might amend the ASA or a relevant agency might promulgate regulations under the ASA to implement directives against discrimination or the fostering of athletic opportunities for disabled amateur athletes or risk losing federal funding.  *C.f.* 34 C.F.R. §  106.41 (regulatory provisions implementing proscription against sex discrimination in education programs receiving federal funding stated in Title IX and requiring the proportionate allocation of athletic opportunities and moneys for college women or lose federal funding).  *See Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 827-28 (10th Cir. 1993)(applying Title IX and its implementing regulations to order state university to reinstate terminated Division I women's softball program).

gold, silver, and bronze medal an athlete wins at the Olympic Games.  (Am. Compl., 03-cv-1364, ¶ 52.).  Olympic programming also includes, but is not limited to, providing Olympic athletes first priority in using USOC training facilities (¶ 54) and making Basic Grants, Tuition Assistance Grants, and Elite Athlete Health Insurance available to Olympic athletes.  *Id.* ¶¶ 55-57.

Olympic programming is not offered to Paralympic athletes.  Rather, Paralympic athletes receive third priority in using USOC training facilities, *id.* at ¶ 54, and the Paralympic medal-incentive is ten percent of that provided to Olympic athletes.  *Id.* ¶ 53 ($2,500, $1,500, and $1,000, respectively, for each gold, silver, or bronze medal). Moreover, the USOC does not make Basic Grants, Tuition Assistance Grants, or Elite Athlete Health Insurance available to Paralympic athletes.  *Id.* at ¶¶ 55-57, 59.  Plaintiffs assert the USOC's original and amended Constitutions discriminate against Paralympic athletes, first by denying them participation on the Athlete Advisory Committee all together, and now by limiting their representation to two members.  *Id.* ¶ 68-69.

Plaintiffs Scott Hollonbeck, Jose Antonio Iniguez, Jacob Walter Jung Ho Heilveil (collectively Athlete Plaintiffs), are all current or former Paralympic athletes.  (Am. Compl. ¶¶ 35, 39, 42-43, 45-47.)   They assert the USOC's system of distributing benefits discriminates against them on the basis of their disabilities.  *Id.* at ¶ 48.  As a result of being denied Olympic programming, Athlete Plaintiffs assert they have incurred significant personal expense that diminishes their ability to train and their opportunity to compete on behalf of the United States as Paralympians.  *See id.* at ¶ 60.  In addition,

24

Plaintiff Hollenbeck states he was discriminated against during the 1992, 1996 and 2000 Olympic Games by being denied certain intangible benefits of participation, including medal compensation and marching in the opening ceremonies. *Id.* ¶¶ 61-67. As set forth above, Defendants move to dismiss.

## A. Preemption.

Defendants contend Plaintiffs' ADA and Rehabilitation Act claims are "actually challenges to the method and reasoning by which the USOC decides to allocate its limited resources to numerous different athlete classes under its jurisdiction" and therefore within the USOC's exclusive jurisdiction 36 U.S.C. § 220503(3). *See* Defs.' Mot. Dismiss, 03-cv-1364, at 6. In support of this argument, Defendants cite several cases in which courts have held no private right of action exists under the ASA to challenge matters left exclusively to the USOC or the national governing bodies of individual amateur sports. *Id.* at 5 (citing *Martinez v. USOC*, 802 F.2d 1275 (10th Cir. 1986)(holding Congress did not intend for USOC to be liable in tort for wrongful death of boxer injured during events not fully controlled by USOC); *Oldfield v. Athletic Congress*, 779 F.2d 505 (9th Cir. 1985)(no private cause of action to challenge governing body's determination regarding loss of amateur status); *Michels v. USOC*, 741 F.2d 155 (7th Cir. 1984)(weightlifter had no cause of action under ASA to challenge suspension for positive drug test); *DeFrantz v. USOC*, 492 F. Supp. 1181 (D.D.C. 1980)(1978 ASA changed USOC's charter but did not alter USOC's exclusive authority to decide not to send an American team to 1980 Olympics), *aff'd*, 701 F.2d 221 (D.C. Cir. 1980); *Walton-Floyd v. USOC*, 965 S.W.2d 35

25

(Tex. Ct. App. 1998)(no private cause of action under ASA in tort for breaching duty of care in connection with drug testing hotline); *Dolan v. U.S. Equestrian Team, Inc.*, 608 A.2d 434 (N.J. Super. Ct. App. Div. 1992)(USOC has exclusive jurisdiction over athlete eligibility determinations and no private cause of action is recognized under ASA to challenge nonselection for U.S. equestrian team)).

Athlete Plaintiffs agree with Defendants that the ASA bars private rights of action brought under the Act (Pls.' Opp'n at 18), but reject any characterization of their claims as "pertaining" exclusively to the United States' participation in the Olympic, Paralympic and Pan-American Games.  Plaintiffs contend the duty to allocate benefits to Paralympians in a nondiscriminatory manner arises not from the ASA, but from the ADA and Rehabilitation Act, and requires them to effect their corporate mandate in a way that does not discriminate on the basis of disability.  *Id.* at 23.

Plaintiffs support their argument with several cases in which courts have permitted plaintiffs to proceed with a variety of claims in spite of the defendants being governed by the ASA.  *Id.* at 20-21 (citing *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001)(RICO and conspiracy allegations brought by athlete against USOC in blood doping case not preempted, but failed under 12(b)(6) standard to state claim; *Akiyama*, 181 F. Supp. 2d at 1183 (holding title II of Civil Rights Act of 1964 applied to prevent discrimination on basis of religion at judo competition); *Sternberg v. U.S.A. Nat'l Karate-do Fed'n, Inc.*, 123 F. Supp.2d 659 (E.D.N.Y. 2000)(female athlete stated valid Title IX claim against karate national governing body based on organization's decision to

26

withdraw women's karate team from international competition).[14]

To this list we may add *Lee v. United States Taekwondo Union*, 331 F. Supp.2d 1252 (D. Haw. 2004), in which the district court rejected the USOC's contention that the ASA preempted federal civil rights laws and allowed former U.S. Olympic coach to bring a race discrimination claim against the USOC and the national governing body for the sport of taekwondo under 42 U.S.C. § 1981.  The district court applied the reasoning in *Oldfield*, *Slaney* and *Michels* to distinguish between private claims challenging eligibility or similar matters "pertaining to participation" regarding which the USOC and its national governing bodies have exclusive jurisdiction under 36 U.S.C. § 22503(3) and claims that invoke rights independently of this grant of jurisdiction.  Thus, to the extent plaintiff Lee was seeking a declaration of eligibility and subsequent reinstatement as coach of the U.S. Olympic Taekwondo Team through his state tort and contract claims, the court concluded such claims were preempted.  *Lee*, 331 F. Supp. 2d at 1257.  To the extent Lee was invoking protections afforded him under federal civil rights laws independently of and in

---

[14]  I note that in addition to allowing plaintiff athlete's Title IX claim to proceed, the district court in *Sternberg* did, indeed, recognize an implied private right of action under the ASA to seek damages against a the karate national governing body for sex discrimination.  *Sternberg*, 123 F. Supp.2d at 664-666 (applying four factors identified in *Cort v. Ash*, 422 U.S. 66 (1975) and principles articulated in *Cannon v. University of Chicago*, 441 U.S. 677 (1979) and *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) to conclude Congress's statements in ASA prohibiting sex discrimination and requiring governing bodies to provide "support and encouragement" for participation by women permit "[a] narrow right of action regarding sex discrimination by national governing sports bodies [to] be implied.").  Plaintiffs do not rely on this aspect of *Sternberg*, conceding that in the Tenth Circuit, at least, no private right of action exists to enforce the terms of the ASA.  *See Martinez*, 802 F.2d at 1281 (enactment of 1978 ASA included removing athlete's "bill of rights," evincing Congress's consideration and rejection of a cause of action for athletes to enforce ASA's provisions).

addition rights governed exclusively by the ASA, however, his claims were not preempted. *Id.* at 1260-61 ("when two federal statutes may be reconciled, the court must give effect to both"), *citing Watt v. Alaska*, 451 U.S. 259, 267 (1981)).  As long as the remedy sought does not require it to enter the realm of the USOC's exclusive jurisdiction, "the [ASA] does not nullify or supersede other federal laws that provide private rights of action to ensure freedom from discrimination."  *Id.* at 1260 (because discrimination on the basis of race in violation of § 1981 did not pertain to the United States' participation in the Olympic Games, Lee could proceed with his § 1981 claim).

The instant case presents an exceedingly close call under *Lee* and related authorities because the matters of which Plaintiffs complain – priority usage of training facilities, training grants and insurance benefits, the USOC's Constitutional governance structure, medal incentives and decisions as to who walks or does not walk in Olympic opening ceremonies –  indeed sound like "matters pertaining to" the United States' participation in the Olympic or Paralympic Games within the exclusive jurisdiction of the USOC under 36 U.S.C. § 22503(3).  Given the predominate mandates of the ADA to call out and remedy disability-based discrimination, as well as the inexactness of the injunctive relief sought, [15] I cannot categorically state that Plaintiffs' Athlete Claims fall within the exclusive realm of "matters pertaining to the participation of the United States

---

[15]  As previously noted, Plaintiffs request for relief in this case is in the nature of injunctive relief to be determined at trial, the goal of which is to provide Plaintiffs with benefits and incentives which, while not necessarily *equal* to those given Olympians, will ensure Paralympians their full and equal enjoyment of the Olympic experience.

in the . . . Paralympic Games."

I proceed, then, to analyze Plaintiffs' allegations of discrimination under the ADA and Rehabilitation Act under a 12(b)(6) standard.

## B.  Standard of Review

The purpose of a Fed. R. Civ. P. 12(b)(6) motion to dismiss is to test the sufficiency of a complaint. *U.S. Olympic Comm. v. Am. Media, Inc.*, 156 F. Supp. 2d. 1200, 1204 (D. Colo. 2001).  A complaint must put the defendant on notice of the plaintiff's claim and the general facts upon which it is based. *Brunetti v. Rubin*, 999 F. Supp. 1408, 1409-10 (D. Colo. 1998)(incorporating Fed. R. Civ. P. 8(a)).  A plaintiff need not precisely state the elements of each claim, but he must provide direct or inferential allegations that would support recovery under some legal theory. *Id.*  There is a strong presumption against granting a motion to dismiss for failure to state a claim, *Maez v. Mtn. States Tel & Tel., Inc.*, 54 F.3d 1488, 1496 (10th Cir. 1995)(referring to the Federal Rules of Civil Procedure), and unless it is clear "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," such motions must be denied. *American Media*, 156 F. Supp. 2d. at 1204 (internal citations and quotations omitted).  Accordingly, well-pleaded allegations in the complaint must be treated as true, and any reasonable inferences arising from them must be construed in the plaintiff's favor. *Id.*

## C. Conclusions of Law.

I have already expressed my doubts regarding the viability of Plaintiffs' ADA

claim based on the disconnection between the goods and services being denied and Plaintiffs rights to them as "public accommodations," as well as my concerns that at least some of Plaintiffs' complaints fall outside the scope of federal antidiscrimination laws because they pertain to matters over which the USOC has exclusive jurisdiction. Nevertheless, and in order to develop the record fully, I proceed to analyze Plaintiffs' Rehabilitation Act and ADA claims on their merits.

The ADA and Rehabilitation Act are interrelated Congressional mandates designed to remedy discrimination against disabled individuals. *See McGeshick v. Principi*, 357 F.3d 1146, 1149 (10th Cir. 2004). The Rehabilitation Act provides the baseline level of protection from disability discrimination when the ADA must be construed. *See id.* at § 12201(a)("Except as otherwise provided . . . nothing in this chapter shall be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973 . . . .").

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. § 794(a)(2006).[16]  The prima facie elements of claim under section 504 of

---

[16]      To the extent Section 504 was modified between the issuance of this Order and the time *Shepherd* was filed, those modifications are immaterial. *Compare* 29 U.S.C.A. § 794(a)(2002) *with* 29 U.S.C.A. § 794(a)(1998).

the Rehabilitation Act are straightforward, requiring a plaintiff to show (1) he is disabled; (2) he is otherwise qualified for participation in the program; (3) the program discriminates against the plaintiff; and (4) the program receives federal financial assistance. *McGeshick*, 357 F.3d at 1150 (citing cases).

On the other hand, the prima facie elements of an ADA claim depend on a number of factors, including the alleged theory of discrimination, *see*, *e.g.*, *Fortyne v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004)(prima facie elements in Title III failure to accommodate case); *Hubbard v. Twin Oaks Health and Rehab. Ctr.*, 408 F. Supp.2d 923, 929 (E.D. Cal. 2004)(prima facie elements in Title III failure to remove barrier case); *In re Baby K*, 832 F. Supp. 1022, 1028-29 (E.D. Va. 1993)(prima facie elements in Title III denial of participation case), and the factual circumstances of the case. *See*, *e.g.*, *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006)(plaintiff must show he was qualified academically where failure to accommodate alleged in post-secondary education context); *cf. Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1164 (10th Cir. 2002)(applying *McDonnell Douglas* burden shifting framework in Title I case "as modified to relate to differing factual situations").  As previously set forth, Plaintiffs in the instant case assert three different theories of discrimination under §§ 12182(b)(1)(A)(i) (denial of participation), (ii)(unequal participation opportunity) and (b)(2)(A)(i) (discriminatory eligibility criteria tending to screen them from full and equal enjoyment).  Accordingly, to state a prima facie case of discrimination under the ADA and Rehabilitation Act, Plaintiffs must demonstrate (1) they are disabled; (2) Defendants

operate places of public accommodation; (3) Plaintiffs are qualified for participation in the program or program benefits of the public accommodation; and (4) the USOC discriminated against Plaintiffs by denying them the opportunity to participate in the program, by providing them a participation opportunity unequal to that afforded non-disabled individuals, and/or by using eligibility criteria for program benefits that screens out or tends to screen out the disabled from fully enjoying the program.

I have already determined the USOC does not operate a "place of public accommodation" or, if it does, that the discrimination alleged by Plaintiffs relates not to their rights of access to *that* accommodation or, with the exception of priority access to gymnasia or other physical training facilities of the U.S. Olympic Training Centers, to the benefits thereof, but to their right to participate in and receive full and equal enjoyment of membership on a USOC-sponsored *team*.  Looking beyond those "problems of fit," however, the question arises as to whether, in a Title III case premised on allegations of disparate treatment between categories of disabled and non-disabled individuals in the benefits of an athletic program, a Title III plaintiff must, like his counterparts proceeding under the Rehabilitation Act and Titles I and II of the ADA,[17] demonstrate that he is both disabled *and* "otherwise qualified" to receive the benefits that form the basis of his claim

---

[17]     *Compare* 29 U.S.C. § 794(a) (Rehabilitation Act, prohibiting discrimination against any "qualified individual with a disability" on the basis of that disability), 42 U.S.C.A. § 12112(a)(Title I, prohibiting employment discrimination against a "qualified individual with a disability") *and* § 12132 (Title II, public entities shall not discriminate against a "qualified individual with a disability") *with* § 12182(a)(private entities may not discriminate against any "individual . . . on the basis of disability," where the term "qualified" does not appear).

of discrimination.  Under the circumstances of this case, I agree with Defendants that he does.

The ADA addresses three broad categories of discrimination:  disparate treatment, disparate impact, and a failure to provide a reasonable accommodation.  *E.g. Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188-89 (10th Cir. 2003)(making the assertion in a Title I employment case).  Plaintiffs' allegations in this case are of classic disparate treatment, *i.e.*, that they, as Paralympians, receive reduced benefits and fewer privileges than their non-disabled counterparts purely on the basis of their disability.  It is clear that in disparate treatment cases, an individual must be otherwise qualified to receive the benefit he asserts it is discriminatory to deny him.

The logical explanation for the omission of an "otherwise qualified" requirement under Title III is that, "in most circumstances, no qualifications are required to enjoy a public accommodation as secured by Title III."  *Mershon*, 442 F.3d at 1976.  Where, by contrast, the nature of a "public" accommodation is such that it provides programs only to qualified members of the general public, a disabled individual must show he is also qualified as an element of his prima facie case.  *See Martin*, 532 U.S. at 680 (significant in Title III case that, "[i]n consideration of the entry fee, any golfer with the requisite letters of recommendation acquires the opportunity to qualify for and compete in petitioner's tours").  *See also Bowers*, 118 F. Supp.2d at 517, n. 18 ("[w]hile words 'otherwise qualified' or 'qualified individual' do not appear in the language of Title III, Title II analysis can be applicable to Title III claims."); *cf. Bercovitch v. Baldwin Sch.,*

33

*Inc.*, 133 F.3d 141, 154 (1st Cir. 1998)(finding little significance in lack of "qualified"

language in Title III).  This requirement is consistent with the law construing the

Rehabilitation Act, and I conclude Plaintiffs must prove they were *qualified* individuals

with a disability whose disparate treatment can only be explained as discrimination on the

basis of disability.

A plaintiff is "otherwise qualified" under the Rehab Act if he "is able to meet all

of a program's requirements in spite of his [disability]."  *Southeastern Community*

*College v. Davis*, 442 U.S. 397, 406 (1979).  To satisfy the prima facie qualification

element under both the ADA and Rehab Act, Athlete Plaintiffs must show that with or

without reasonable modification to USOC rules, policies, or practices, they meet the

essential eligibility requirements for Olympic benefits.

### *Appropriate Comparison Group – Unified or Separate Program.*

Plaintiffs contend the necessary eligibility requirement for Olympic benefits is not

membership on the U.S. Olympic team, but membership on any of the three teams under

the USOC's purview under its federally mandated charter (i.e., the U.S. Olympic, Pan-

American or Paralympic Teams).  In other words, because the USOC oversees a single,

comprehensive program for that group of elite, world-class athletes who participate as

representatives of the United States in the Olympic, Paralympic or Pan-American Games,

Plaintiffs contend the USOC cannot discriminate in its allocation of benefits to that group

on the basis of disability alone.

As previously set forth, Plaintiffs' characterization of the USOC as a single

selection and training organization charged with allocating programming and benefits in a nondiscriminatory manner across all Olympic, Paralympic and Pan-American athletes is belied by the organizational structure established by the ASA, the USOC's federal charter and the legislative history evincing Congress's intent in enacting both.  It suggests – inaccurately – that Congress's 1998 amendments to the ASA did more than formalize recognition of the existing Paralympic movement and add the Paralympics to the list of international competitions to which the United States will send representatives.  It also ignores the separate nature of the participation opportunity that forms the historical essence of the Paralympic experience, and glosses over the distinction between equality of *access*, in terms of participation opportunity, and the quality of that access once provided.  Here, the participation opportunity for wheelchair athletes is clearly provided through a separate (Paralympic) program.

The cases Plaintiffs cite to urge a comparison with the USOC's "unified" Olympic/Paralympic/Pan-American "program" do not compel a contrary conclusion because they turn on a denial of *access* to the unified "program," which is not at issue in this case.[18]  *Dreher Park*, for example, involved the elimination, entirely, of all

---

[18]     Both *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 846 F. Supp. 986 (S.D. Fla. 1994) and *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) involved the elimination of programs or facilities for the disabled.  In *Dreher Park*, the district court held the elimination of specialized recreational programs for disabled children had the effect of denying disabled individuals the benefits of the city's overall recreational program in violation of Title II. The court rejected the city's argument that the elimination could not be deemed discriminatory because many of its non-specialized programs were accessible by the disabled, because the elimination had the effect of denying disabled individuals programming "needed to give equal benefits of recreation to persons with disabilities."  846 F. Supp. at 991-92.  Similarly in *Rodde*,

specialized recreational programs for the disabled and the district court's ruling that

plaintiffs did not have to establish eligibility to participate in a specific recreational

program to challenge that elimination.  The court used wheelchair soccer as an example,

concluding wheelchair-bound youth did not have to establish they were otherwise able

"run" or "kick" to challenge the program's elimination, because the relevant program

benefits they were seeking were not simply participation on a soccer team, but the

benefits of the City's overall recreational/athletic program.

> As a paradigmatic scenario, it may be the case that there are wheelchair-
> bound children who cannot meet the 'essential requirements' for a soccer
> team because they cannot run or cannot kick a ball.  However, such an
> analysis would be persuasive only if the full and entire extent of the City's
> recreational program was one soccer team.  An 'essential eligibility
> requirement" of a *soccer team* may be the ability to run and kick, but the
> only "essential eligibility requirement" of the City's *recreational program*
> (which is the sum of a variety of individual recreational, social, and
> educational activities and programs) is the request for the benefits of such a
> program.  (Citations omitted.)  Therefore, the only 'essential eligibility
> requirement' that Plaintiffs must meet is to request the benefits of a
> recreational program.

*Dreher Park*, 846 F. Supp. at 990 (emphasis original).  Here, the USOC has not

eliminated its Paralympic Team (and doing so would violate its federal charter) and the

benefits Plaintiffs seek are not of access to the Olympic experience or participation in

---

the Ninth Circuit held the shutting down of defendant's only hospitals designed to serve disabled individuals violated Title II because the services designed for the general population, while available to the disabled, "would not adequately serve the unique needs of the disabled who therefore would be effectively denied servises that the non-disabled continued to receive."  357 F.3d at 998.  The "benefits" denied plaintiffs in these cases were the benefits of *access* to meaningful programming, not the *quality* of access afforded (and access, I might add, not challenged as ineffective or unmeaningful).

elite athletics, but of the quality of their experience as Paralympians compared to the

experience of non-disabled Olympians.  *Dreher Park* does not get Plaintiffs there.  By

refusing to couch their claims in terms of a comparison of separate benefits under 42

U.S.C. § 12182(b)(1)(A)(iii), there is simply no basis in the ASA, ADA or relevant case

law to avoid the eligibility requirement of Olympic Team membership to claim

discrimination in the denial of Olympic Team benefits.[19]

Next, Plaintiffs argue the criterion used to determine eligibility for Olympic

programming (i.e., being selected to the Olympic, as opposed to Paralympic, Team) is

invalid because it is facially discriminatory.  Resp. at pp. 6-9 (arguing USOC eligibility

criteria is invalid because it is a proxy for facial discrimination and is analogous to the

inequities Title IX was designed to remedy).  I find the argument somewhat facile and the

analogy to Title IX inapt.  Where factors such as disability or sex render individuals

unable to participate without a separate program or participation opportunity, the question

---

[19]     In this regard I agree with Defendants that *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996) provides the better analogy.  In *Chandler*, the Ninth Circuit ruled the legislature's welfare amendments to provide eligible needy individuals with dependent children benefits for unlimited duration while providing needy disabled individuals benefits for only one year did not violate Title II because disabled individuals' ineligibility for the longer term benefits did not turn on their disabled status.  In so holding, the Ninth Circuit rejected appellees' reliance on *Dreher Park* to argue the proper characterization of the "program" for eligibility purposes was the overall purpose of benefitting the needy.  According to the Court, the fact that the non-disabled needy without dependent children were not entitled to funds under the program suggested the proper view was of two discrete forms of benefit providing for two discrete subgroups of the needy population.  As in *Chandler*, the better view of the USOC's purpose in fostering participation and competition in the Olympic/Pan-American and Paralympic Games is oversight over two discrete forms of benefits providing for two discrete subgroups of elite, world-class amateur athletes.

becomes one of the effectiveness or equality of the separate benefit and not that the

creation of the separate participation opportunity itself is tantamount to unlawful

discrimination.[20]  Title III is grounded in this distinction, defining discrimination as the

imposition of eligibility criteria that tend to screen out the disabled "unless . . . necessary

for the provision of the goods, services, facilities . . . or accommodations being offered";

the failure to modify policies "unless  . . . the entity can demonstrate that making

modifications would fundamentally alter the nature of such goods, service . . ."; or failing

to take steps to ensure the disabled are not segregated "unless . . . taking such steps would

fundamentally alter the nature of the good, service . . . ".  *See* 42 U.S.C. §

12182(b)(2)(i) - (iii).  *See* H.R. Rep. No. 101-485, pt. 1, at 58 (1990), *reprinted in* 1990

U.S.C.C.A.N. 445, 481 (providing illustrative examples such as a rule that prohibits the

deaf or blind from entering a store or requiring customers to present a driver's license in

order to purchase merchandise, because that would screen out persons with disabilities

who do not drive).  Because Plaintiffs do not challenge Paralympic programming under a

separate benefit analysis, their claims hinge on the assertion that no valid basis other than

invidious discrimination justifies the "eligibility criteria" of being an Olympian to receive

Olympic benefits.

### The Necessary "Qualification" of being an Olympian does not Constitute

---

[20]    *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005)(in prisoner case, disabled prisoner would not have been "otherwise qualified" to receive medical treatment in absence of his alleged disability because his alleged disability was reason why he was seeking medical treatment in the first instance).  *Accord Chandler*, *supra*, n. 16.

### Discrimination under 42 U.S.C. § 1282(b)(2)(A).

The method for challenging a qualification as discriminatory in violation of the

ADA and Rehab Act is to show that it either screens out or tends to screen out disabled

individuals and is unnecessary or nonessential.  *See* 42 U.S.C.A. § 12182(b)(2)(A)(i); 45

C.F.R. § 84.13 (analogous Rehabilitation Act regulation for challenging criteria that

screen out or tend to screen out disabled individuals); *see also Pottgen v. Missouri State*

*High Sch. Activities Ass'n*, 40 F. 3d 926, 930 (8th Cir. 1994)(using "necessary" and

"essential" interchangeably in qualification analysis).   Assuming the USOC's eligibility

criteria of being an Olympic athlete screens out disabled individuals, the USOC urges it is

essential to furthering its purpose of training and obtaining the best Olympic athletes to

represent the United States.  (Mot. Dismiss at 15.)  Plaintiffs respond first by contending

a determination of whether the USOC's eligibility criteria is necessary is inappropriate at

this stage because they have not indicated the existence of an affirmative defense in the

Amended Complaint.  (Resp., p. 14.)  Alternatively, Athlete Plaintiffs argue the eligibility

criteria is unnecessary because the USOC mandate of training and obtaining the best

athletes applies equally to Olympians and Paralympians, and therefore "limiting benefits

to Olympic athletes is not necessary for the provision of the benefits being offered."  *Id.*

Both arguments fail.

First, where "the applicability of [an affirmative] defense [is] clearly indicated and

. . . appear[s] on the face of the pleading," a complaint is subject to dismissal on that

basis.  5B C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, pp.708-10 (3d

ed. 2004).  Here, it is apparent from the allegations in the Complaint that Athlete

Plaintiffs are challenging the eligibility criterion used to deny them Olympic

programming 42 U.S.C. § 12192(b)(A)(i), which invites the affirmative defense also

stated in that statute that such a criterion is permissible if it is shown to be "necessary"

for the provision of the accommodations being offered generally.  *Id.*  Accordingly, I turn

to whether the facts as pleaded render the eligibility criterion of being an Olympic Team

member "necessary" to the provision of Olympic programming, generally.

In assessing the necessity of the USOC's eligibility criteria for Olympic

programming, the "goods, services, facilities, privileges, advantages, or accommodations"

that Athlete Plaintiffs were allegedly wrongly denied must be identified.  *See* 42 U.S.C. §

12182(b)(2)(A)(i).  Plaintiffs assert the goods, services, facilities, and privileges at issue

are the financial and other intangible benefits and training priority given Olympic, as

opposed to Paralympic, athletes.  (Pls.' Resp. at 15.)  Plaintiffs plead no facts tending to

demonstrate these benefits are not "necessary" to the maintenance of the Olympic team,

and simply rests on the assertion that the eligibility criterion of selection to the Olympic,

as opposed to the Paralympic, team in order to receive Olympic benefits is invalid.

It is here that the concern over the characterization of the Olympic Training

Centers as "public accommodations" merges with the necessary elements of a claim

under the Rehabilitation Act and ADA.  Assuming, for the sake of argument, that the

ADA requires the USOC to provide anything as a "public accommodation," it is the

opportunity to represent one's country in a recognized amateur sport in one of three

categories of sanctioned (Olympic/Pan-American or Paralympic) competition. *See Martin*, 532 U.S. at 680 (the PGA provides an opportunity for any golfer, disabled and non-disabled alike, to vie for the opportunity to qualify for the PGA Tour); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 274 (2d Cir. 2003) (the ADA and Rehabilitation Act viewed as "helping individuals with disabilities access public benefits *to which both they and those without disabilities are legally entitled*")(emphasis added).  And unlike the golfer in *Martin* who could compete on the PGA Tour with accommodation, Plaintiff Paralympians cannot and do not purport to be able to compete in the Olympics with or without accommodation.  Instead, they compete through the separate participation opportunity of representing the United States as Paralympians.  Once afforded access to the benefits of the so-called "public accommodation" afforded by Congress through the ASA, the right to the nondiscriminatory provision of *Olympic* benefits stops.

Simply put, it is irrelevant that the USOC chooses to provide Olympic programming only to Olympic athletes as long as the gateway to that program operates in a nondiscriminatory manner.  However unfair the fact that the participation opportunity afforded Plaintiffs as Paralympians does not include full Olympic benefits, Plaintiffs are afforded a participation opportunity defined by their disability, the benefits of which are lesser based not an additional layer of discrimination but by operation of eligibility criteria beyond the reach of the ADA and Rehabilitation Act.

In short, Paralympic athletes' expectations for the equitable allocation of benefits between Paralympians and Olympians competing on behalf of the United States under the

auspices of the USOC is not a matter which courts, through the ADA, may mandate or enforce.  While much to be desired, such a mandate must derive from the legislative branch or appropriate agency of the Executive.  As urged by Plaintiffs' counsel at oral argument, Title IX and its implementing regulations may indeed form an apt analogy – not as infusing the ADA with additional remedies to then be grafted onto the ASA –  but as a paradigm for appropriate congressional and agency action.

Based on the foregoing, I conclude that Plaintiffs' Athlete Claims, which challenge the USOC's inequitable allocation of resources and benefits to them as Paralympians compared to those afforded Olympians generally, fail to state a claim upon which relief under the ADA or Rehabilitation Act may be granted.   I therefore **GRANT** Defendants' Motion to Dismiss in *Hollonbeck*, 03-cv-1364, which in turn disposes of the identical issue presented as a Motion for Summary Judgment in *Shepherd*, 99-cv-2077.

These cases will be set for a status conference within ten days of the date of this Memorandum Opinion and Order to formulate a pretrial plan for Plaintiffs' remaining claims.   In anticipation of this conference, the parties are to submit a brief status report setting forth their respective positions regarding the continued viability of Plaintiffs' Vie Sports Marketing-related claims in the wake of my decision.

Dated November 16, 2006.      **s/John L. Kane**
                        SENIOR U.S. DISTRICT JUDGE